1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **B & H MANUFACTURING COMPANY, INC.,** | ) | **CV F 01 6619 AWI SMS** |
| | ) | |
| **Plaintiff**, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER DENYING RENEWED** |
| **v.** | ) | **MOTION FOR JUDGMENT AS A** |
| | ) | **MATTER OF LAW** |
| **LYN E. BRIGHT**, **ByH DE LAS** | ) | |
| **AMERICAS, S.A. de C.V., and DOES** | ) | |
| **1 THROUGH 10, inclusive,** | ) | (Document # 591) |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

In the third amended complaint, filed on February 19, 2004, Plaintiff raised four causes of action: (1) False Designations of Origin and False Descriptions in violation of 15 U.S.C. § 1125(a); (2) Dilution in violation of 15 U.S.C. § 1125(c); (3) Infringement of Registered Trademarks in violation of 15 U.S.C. § 1114; and (4) Breach of Fiduciary Duty.   After a jury trial, on October 8, 2004, the jury returned a verdict for Plaintiff.   Pursuant to the verdict form, the jury awarded Plaintiff $145,000 for Defendant Bright's breach of fiduciary duty, $501,500 for Defendants' trademark infringement, $105,000 for dilution, and $100,000 for Defendants' trade dress infringement.   Pending before the court is Defendants' renewed motion for judgment as a matter of law on Plaintiff's claims for trade dress infringement and trademark dilution.

**LEGAL STANDARD**

The court may enter a judgment as a matter of law if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue.    Fed.R.Civ.P. 50(a). Federal Rule of Civil Procedure 50(b) provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.   The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment - and may alternatively request a new trial or join a motion for a new trial under Rule 59.  In ruling on a renewed motion, the court may:
> > (1) if a verdict was returned:
> >   (A) allow the judgment to stand,
> >   (B) order a new trial, or
> >   (C) direct entry of judgment as a matter of law; or
> > (2) if no verdict was returned;
> >   (A) order a new trial, or
> >   (B) direct entry of judgment as a matter of law.

In the Ninth Circuit, judgment as a matter of law is appropriate when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002); Omega Envt'l, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1161 (9th Cir.1997).   In other words, judgment as a matter of law may be granted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. . . ." Fed.R.Civ.P. 50(a)(1); Juhnke v. EIG Corp., 444 F.2d 1323, 1325 (9th Cir.1971) (noting that directed verdict and motion for judgment notwithstanding verdict "are measured by the same standard as the latter is merely a renewal of the former").

In considering a motion under Rule 50(b), "the court is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the nonmoving party."  Winarto v. Toshiba America Electronics Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001); Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873, 877 (9th Cir.1984).   The court is bound to view the evidence in the light most favorable to the prevailing

party and to give that party the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.   <u>Continental Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690, 696 (1962); <u>Cockrum</u>, 479 F.2d at 86.   "The court must accept the jury's credibility findings consistent with the verdict." <u>Winarto v. Toshiba America Electronics Components, Inc.</u>, 274 F.3d 1276, 1283 (9th Cir. 2001) (quoting <u>Bilbrey by Bilbrey v. Brown</u>, 738 F.2d 1462, 1468 n. 8 (9th Cir.1984)).   When two sets of inferences find support in the record, the inferences that support the jury's verdict win the day on the appeal of a grant of a motion for judgment as a matter of law.   <u>See</u> <u>Winarto</u>, 274 F.3d at 1287 ("When two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day.")  . The court "may not substitute its view of the evidence for that of the jury."   <u>Johnson v. Paradise Valley Unified Sch. Dist.</u>, 251 F.3d 1222, 1227 (9th Cir. 2001).

"A jury's verdict must be upheld if it is supported by substantial evidence." <u>Johnson v. Paradise Valley Unified Sch. Dist.</u>, 251 F.3d 1222, 1227 (9th Cir.2001).   Substantial evidence is evidence that is adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion from the same evidence.   <u>Id</u>.

## DISCUSSION

Defendants contend that they are entitled to judgment as a matter of law on Plaintiff's claims for trade dress infringement and dilution.   Plaintiff contends there is no basis for disturbing the jury's findings on trade dress infringement and dilution.

**A.  Trade Dress**

Defendants contend that they are entitled to judgment as a matter of law on Plaintiff's trade dress infringement claim because Plaintiff did not establish that Plaintiff's product configuration was functional, Plaintiff failed to present evidence of a secondary meaning associated with any non-functional trade dress, and Plaintiff failed to present evidence of damages caused by infringement of a non-functional trade dress.

In the Ninth Circuit, trade dress "refers to the 'total image of a product' and may include

1  features such as size, shape, color, color combinations, texture or graphics." International

2  Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993); Vision Sports, Inc. v.

3  Melville Corp., 888 F.2d 609, 613 (9th Cir.1989).  To establish trade dress infringement, a

4  plaintiff must show (1) that its product design is non-functional, (2) that the design is inherently

5  distinctive or has acquired a secondary meaning, and (3) that there is a likelihood of confusion.

6  Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1005 (9th Cir.1998);

7  Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1046-47 (9th Cir.1998);

8  International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 823 (9th Cir. 1993).  Because

9  affording trade dress protection to product designs may hinder legitimate competition, the Ninth

10  Circuit has advised district courts to evaluate such claims with greater scrutiny than claims

11  involving other forms of trade dress.  Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 199

12  F.3d 1009, 1012-13 (9th Cir. 1999).

13  ***1.  Non-Functional***

14        The requirement of non-functionality is based "on the judicial theory that there exists a

15  fundamental right to compete through imitation of a competitor's product, which right can only

16  be temporarily denied by the patent or copyright laws."  Leatherman Tool Group, 199 F.3d at

17  1011-12.   Product features are functional if they are "essential to the use or purpose of the

18  article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would

19  put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson

20  Prods. Co., 514 U.S. 159, 165 (1995).  A design feature of a particular article is "essential" only

21  if the feature is dictated by the functions to be performed; a feature that merely accommodates a

22  useful function is not enough.  E.g., In re Morton-Norwich Products, Inc., 671 F.2d 1332, 1342

23  (Cust. & Pat.App. 1982) (shape of plastic container for spray products not essential to its purpose

24  as a sprayer).  A design feature "affecting the cost or quality of an article"  is one which permits

25  the article to be manufactured at a lower cost, e.g., Kellogg Co. v. National Biscuit Co., 305 U.S.

26  111, 122 (1938) (pillow shape of shredded wheat biscuit functional as cost would be increased

27

28                                              4

1  and quality lessened by other form), or one which constitutes an improvement in the operation of

2  the goods, e.g., <u>Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.</u>, 626 F.2d 193, 195 (1st Cir.

3  1980) (two-tier design of woodstove functional because improving the operation of the stove in

4  three respects).  The Ninth Circuit considers four factors when determining whether features of a

5  product are functional: "(1) whether the design yields a utilitarian advantage, (2) whether

6  alternative designs are available, (3) whether advertising touts the utilitarian advantages of the

7  design, and (4) whether the particular design results from a comparatively simple or inexpensive

8  method of manufacture."  <u>Disc Golf Ass'n, Inc. v. Champion Discs, Inc.</u>, 158 F.3d 1002, 1006

9  (9th Cir. 1998).

10      Separable functional features may be protectable when used in combination as non-

11  functional trade dress. <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 842 (9th Cir.

12  1987).  A trade dress must be examined "as a whole, not by its individual constituent parts."

13  <u>Clicks Billiards, Inc. v. Sixshooters, Inc.</u>, 251 F.3d 1252, 1259 (9th Cir. 2001).  The leading case

14  on finding an overall product functional is  <u>Leatherman Tool Group, Inc. v. Cooper Indus., Inc.</u>,

15  199 F.3d 1009 (9th Cir. 1999).   In <u>Leatherman</u>, there was no evidence that anything about the

16  plaintiff's pocket tool, other than the Leatherman name, existed for any non-functional purpose.

17  Rather, every physical part of the Leatherman had its particular shape because that shape works

18  better.  <u>Leatherman</u>, 199 F.3d at 1012-13.  The Ninth Circuit concluded that because the trade

19  dress was "nothing more than the assemblage of functional parts, and [that the] arrangement and

20  combination of the parts is designed to result in superior performance," it would be "semantic

21  trickery to say that there is still some sort of separate but 'overall appearance' which is

22  nonfunctional."  <u>Id</u>.

23      In their brief, Defendants identify several components of the B&H2000 machine and

24  contend that each was functional.  Because all of the B&H2000 machine's identified parts served

25  a functional purpose, Defendants contend Plaintiff's trade dress claim fails as a matter of law.

26  The Ninth Circuit authority cited above requires the court to reject this "divide and conquer"

27

28                                                    5

1    approach.  Rather, the court must consider the trade dress as a whole.  A combination of

2    functional elements may be protectable as long as the combination or arrangement is not itself

3    functional.  Clicks, 251 F.3d at 1259;  Fuddruckers, 826 F.2d at 842.   Thus, the jury could find a

4    trade dress infringement even if the evidence revealed that all parts were functional.

5         Defendants next contend that Plaintiffs did not offer sufficient evidence to show the

6    overall layout of the B&H2000 machine was non-functional.  In this case, the court finds that the

7    evidence submitted to the jury does not only permit the conclusion that the overall layout of the

8    Plaintiff's machine was functional.   Ed Dadisho testified that the linear machine, look of the

9    machine, and "the position of certain components to the product" identified Plaintiff's B&H2000

10   machine.   Mr. Dadisho identified several components on the B&H2000 machine that Defendants

11   had placed in identical locations on their machine that did not have to be placed in identical

12   locations.   For example, Mr. Dadisho stated that the location of the vacuum adjustment valve

13   and dial indicator could have been placed in other locations.[1]   Mr. Dadisho testified these items

14   could have been placed in different locations without affecting the ease of operation.   While Mr.

15   Dadisho agreed that moving the vacuum adjustment valve to some locations would require

16   additional hoses, Mr. Dadisho never conceded that all possible locations for the vacuum

17   adjustment valve and related parts would have been more expensive.   Mr. Dadisho also testified

18   that while vacuum drums are used by all manufactures of labeling machines, different machines

19   use different designs.   Mr. Dadisho agreed with Defendants that all labeling machines needed

20   vacuums.  However, Mr. Dadisho's testimony provides support for Plaintiff's position that to be

21   functional and cost efficient the exact same vacuum drum and parts did not need to located in the

22   same place as the B&H2000 and did not have to be located in the exact same locations.

23        Similarly, Mr. Dadisho identified other parts that were alike on the two machines.   Mr.

24   Dadisho testified that the control switches only needed to be accessible to the operator, but could

25

26        [1] Mr. Dadisho testified the dial indicator and vacuum adjustment valve needed to be

27   placed together.

28                                        6

have been placed just about anywhere.   While Mr. Dadisho conceded that the switches were

functional and their placement was dictated by the location of other parts, there was evidence to

support a finding that it was not necessary to have the control switches in the exact same location

as the B&H2000.    Mr. Dadisho testified that Defendants placed the electric control box and

fault light in the same position as the B&H machine.   These two items needed to be placed

together.   While the evidence showed placing the control box near operator controls would

reduce the cost of manufacture, there was evidence to support a finding that it was not necessary

to place the box in the precise location found on the B&H2000 machine.    There was evidence

from which the jury could find the main frame legs were similarly exposed in both machines.

While having a machine supported by four legs is functional, exposing legs which look in

appearance to be very similar was not necessary.    Defendants also put parts such as the sensor

mounting post and glue mounting post in the same position as on the B&H2000.   Finally, the jury

was allowed to view pictures of Plaintiff's and Defendants' machines, and could note for

themselves the similarity in the entire layout and look of the two machines.    Thus, construing the

evidence in the light most favorable to Plaintiff, the jury could reasonably conclude that the

overall look of Plaintiff's machine was non-functional.

          The evidence does show that in several areas the choices available to a manufacturer are

minimal.    For example, machines can only be set up for left to right or right to left operation.

Label discs can only be placed horizontally or vertically.   Given these limited choices, the fact

Defendants' machine also happened to be set up like Plaintiff's machine, with left to right

operation and a horizontal label disc, taken alone has little significance.    However, in light of

the fact Defendants choose to place so many parts in exactly the same place as Defendants'

machine, the fact Defendants also created a machine that operated left to right and had a

horizontal label disc creates a different circumstantial inference.   There was evidence from which

the jury could have found Defendants made these decisions based on a desire to copy Plaintiff's

machine rather than coincidence.    Thus, there was evidence to support the jury's finding that the

labeling machines did not have to be identical and the B&H2000 machine did not have to be laid out as it was to be utilitarian.  Making all inferences to support the jury's verdict, the first factor favors a finding of  non-functionality.

The second factor also favors the jury's verdict.   Defendant had alternative trade dresses available to it.   Plaintiff provided evidence that the particular positing of components found on Plaintiff's machine and Defendants' machine is not found on any other linear roll-fed labeling machine.   Mr. Dadisho testified that none of the other linear roll-fed machines on the market that compete with Plaintiff's machine have the same look and feel as the B&H machine.   The jury was shown a picture of the Trine 4500 roll-fed label machine.   Mr. Dadisho testified that the differences in the layout, placement of parts, and dimensions of the Trine machine distinguished the look of the Trine machine.    The jury was also given the opportunity to view the Polyclad machine.   The jury was given evidence that at least two other competing manufacturers of roll-fed labeling machines designed their linear machines in a manner that was not identical to Plaintiff's machine.  Thus, making all inferences in support of the jury's verdict, a finding of non-functionality is supported by the fact there were other designs available.

The third factor does not require a different result.   "If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality."  Disc Golf, 158 F.3d at 1009.   Here, there was no evidence that the overall look and feel of the B&H2000 machine was ever advertised as functional.

Finally, the court does not find the jury's verdict contrary to the fourth factor, which looks to whether the design was a result of a simple or inexpensive method of manufacture.  A trade dress may be functional where it "achieves economies in manufacture or use."  Disc Golf, 158 F.3d at 1009.   There was evidence to show that the parts on the B&H machine were not all arranged to provide "economies in manufacture or use."   As discussed above, evidence was presented at trial that all roll-fed labeling machines require similar parts.  However, evidence was presented from which the jury could have concluded that all of the B&H2000's parts did not have

to look similar and be placed in nearly identical locations on Defendants' machine.  Thus, the court does not find that the only reasonable conclusion from the evidence was that the entire look of the B&H2000 was functional.

**_2.  Secondary Meaning_**

Defendants next contend that Plaintiff presented no evidence to establish that its machine had a secondary meaning.  Trade dress must be distinctive to be protectable. A dress is "distinctive and capable of being protected if it _either_ (1) is inherently distinctive _or_ (2) has acquired distinctiveness through secondary meaning."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992).  If a trade dress claim involves the design of a product rather than its packaging, the party asserting its rights must establish that the trade dress has acquired secondary meaning. Wal-Mart Stores, Inc. v. Samara Bros., Inc, 529 U.S. 205, 215  (2000).  As such, in this case, it is unnecessary to determine whether Plaintiff proved its trade dress was inherently distinctive.

Trade dress acquires secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself."  Qualitex, 514 U.S. at 163 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n. 11 (1982)).  Factors courts consider in determining secondary meaning include: (1) whether actual purchasers associate the dress with the source, (2) the degree and manner of advertising by the party seeking protection, (3) the length and manner of use of the dress, and (4) whether the use by the party seeking protection has been exclusive. Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir.1989).

A plaintiff may establish secondary meaning through direct and circumstantial evidence. See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:30 (4th ed. 2005) ("McCarthy").  Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning.  Levi Strauss & Co., 778 F.2d at 1358. A plaintiff may also establish secondary meaning through circumstantial evidence, such as:

exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market. <u>Filipino Yellow Pages v. Asian Journal Publications</u>, 198 F.3d 1143, 1151 (9th Cir.1999); <u>Clamp Mfg. Co., Inc. v. Enco Mfg. Co.</u>, Inc., 870 F.2d 512, 517 (9th Cir. 1989); McCarthy at § 15:30.   Evidence of deliberate copying may, in appropriate cases, support an inference of secondary meaning. <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 844-45 (9th Cir.1987).

Viewing all evidence in the light most favorable to Plaintiff, the court finds a reasonable jury could have found the B&H2000 machine's trade dress had obtained a secondary meaning. Plaintiff provided minimal, but some, evidence that purchasers associated Plaintiff's trade dress with Plaintiff.  Ed Dadisho testified that customers had told him they could identify a B&H machine from the look of it.   Plaintiff also provided evidence from several witnesses that the BH2000 machine was a good selling and popular machine, indicating it was well known in the relevant marketplace.  The length of time B&H used the trade dress of the B&H2000 also supports the jury's finding of secondary meaning.   B&H used its dress in the shape and look of the B&H2000 since the early 1980's.   This length of exclusive use of the B&H2000 is evidence of secondary meaning.  <u>See</u> 15 U.S.C. 1052(f).   Plaintiff itself and through ByH Mexico, when it was Plaintiff's distributor, achieved a measure of success in the roll-fed labeling machine business in Mexico.   Defendant Bright testified that the BH2000 machine was proven and enjoyed high confidence from customers.  Making all inferences for Plaintiff, this evidence was sufficient for the jury to find Plaintiff's trade dress had secondary meaning.   "Evidence of use and advertising over a substantial period of time is enough to establish secondary meaning," <u>Clamp Mfg. Co. v. Enco Mfg. Co.</u>, 870 F.2d 512, 517 (9th Cir. 1989).

As further evidence of secondary meaning, Plaintiff presented evidence of intentional copying.  Evidence of deliberate copying may, in appropriate cases, support an inference of secondary meaning. <u>Fuddruckers</u>, 826 F.2d at 844-45. Miguel Garcia Sanchez testified that he witnessed employees of ByH Mexico disassemble a BH2000 machine and take measurements for

the purpose of building a new machine.   Mr. Garcia Sanchez was instructed to take Plaintiff's

BH2000 manual and identify new part numbers for the assembly of the new machine.   The new

part numbers were to be placed in the manual that was being made for Defendants' machine.

David Bojorquez, Defendants' General Manager, testified that the BT2000X was not designed

from scratch, but was designed from a BH2000, with minor modifications to certain components.

With some minimal exceptions, even Defendant Bright admitted that the BT2000X is

"essentially" a BH2000 with modifications.

        The evidence supporting a finding of secondary meaning was minimal.  However, the

court cannot find it was so lacking that there was no legally sufficient evidentiary basis for a

reasonable jury to find Plaintiff's trade dress had a secondary meaning.

### *3.  Damages*

        Defendants contend that Plaintiff failed to establish causation between Defendants'

machine sales and Defendants' trade dress infringement.  Where a plaintiff establishes trademark

infringement, the plaintiff is entitled to an award, "subject to equitable principles, of 'any

damages sustained by the plaintiff.'"  Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th

Cir.1993) (quoting 17 U.S.C. § 1117(a)).   "Damages are typically measured by any direct injury

which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but

for the infringement." Id.; McCarthy §§ 30:72--30.74.   Although damages in trademark

infringement actions need not be calculated with "absolute exactness," there must be a

reasonable basis for calculation of damages.  Lindy Pen, 982 F.2d at 1407 (quoting Eastman

Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927)).

        The evidence supports a finding that Defendants caused damages to Plaintiff.   While

Plaintiff provided limited evidence on this point, there was evidence that consumers were

confused by Defendants' use of a similar machine.   For example, Patty Mazeriegos testified

about a customer who bought one of Defendants' machines, not realizing that it was

manufactured in Mexico by Defendants.   Further, the jury was only instructed that they needed

11

to find a likelihood of confusion.    When an infringer knowingly adopts a mark, the court can

presume the public will be deceived.  See AMF, Inc. V. Sleekcraft Boats, 899 F.2d 341, 354 (9th

Cir. 1979).  Thus, making all inferences in Plaintiff's favor, a reasonable jury could find

Defendants' trade dress violations caused Plaintiff's harm.

Defendants also contend that no evidence supports the jury's damage amount.

Defendants point out that Plaintiff's own expert only provided the jury with total damage figures

and did not provide the jury with an amount of damages attributable to trade dress infringement.

Defendants take issue with Plaintiff's attorney's suggestion in closing argument that the jury

award damages based on a twenty percent profit for each infringing machine.   Defendants

contend that Plaintiff failed to present any evidence concerning a profit margin relating

exclusively to BH2000 machines.

Preliminarily, the court notes that it is questionable whether Defendants preserved this

issue.  Federal Rule of Civil Procedure 50 requires that a motion for a directed verdict be made

at the close of all the evidence in order to be renewed following entry of judgment.  Zhang v.

American Gem Seafoods, Inc., 339 F.3d 1020, 1029 (9th Cir. 2003); Janes v. Wal-Mart Stores,

Inc., 279 F.3d 883, 886-87 (9th Cir. 2002).[2]  "By definition, a Rule 50(b) motion is a renewal of a

prior Rule 50(a) motion made at the close of evidence and as such is limited to those issues

raised in the previous motion." Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 794 (8th

Cir. 2003).  A renewed motion on a ground not specifically raised in an earlier motion is barred.

Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2nd Cir. 1996).

A review of Defendants' Rule 50 motion reveals no arguments concerning the failure of

Plaintiffs to provide a profit margin for the BH2000 machine and an objection to the argument of

Plaintiff's counsel not being supported by the evidence.   However, at the time Defendants made

---

[2]   Ordinarily, when a party files a procedurally flawed Rule 50(b) motion, the challenge to the jury's verdict is reviewed only for plain error and reversal is proper only to avoid a "manifest miscarriage of justice." Graves v. City of Coeur D'Alene, 339 F.3d 828, 838 (9th Cir. 2003).

their motion, Plaintiff's counsel had not yet made his closing argument.   When preserving an issue for a Rule 50(b) motion, "[t]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position." <u>Walsh v. National Computer Systems, Inc.</u>, 332 F.3d 1150, 1158 (8th Cir. 2003).  Here, Defendants made the court aware of their objection to Plaintiff's lack of evidence supporting any damages steming from trademark violations.   While not made in the confines of their Rule 50 motion, Defendants also objected to Defendants' counsel's use of a twenty percent profit margin because it was not based on the evidence.  Thus, it appears Defendants may have sufficiently made the court aware of its argument concerning the lack of evidence on damages for trade dress infringement.

Regardless of whether Defendants properly preserved their motion, the motion can be denied on the merits. Judgment as a matter of law is appropriate only if the evidence, viewed in the light most favorable to the nonmovant, permits only one possible outcome.   There was sufficient evidence from which the jury could rationally reach a damage figure for trade dress infringement.   There was evidence from which the jury could make their own determination of the gross or net profit margin to be applied in connection with their damage analysis.   Plaintiff's expert, Mr. Wallace testified that the profit margin on all machines was twenty to twenty-five percent.   Evidence was admitted regarding the number of infringing trade dress sales.   The jury was free to review evidence, such as invoices, from which the jury could conclude the number of infringing sales.   Evidence of Plaintiff's balance sheets was also admitted.   The jury was free to add Defendants' infringing sales to Plaintiff's balance sheets to determine an amount of damages.   The jury received testimony about which expenses were fixed and which were variable.  While Plaintiff and Defendant offered differing testimony as to which expenses were fixed and variable, it was the province of the jury to arrive at a number representing how much Plaintiff lost each time Defendants sold an infringing machine. While admittedly no evidence was admitted that Plaintiff had a twenty percent profit margin on the sale of each B&H2000 machine, the court finds the jury was given sufficient information to have determined an

13

1   appropriate profit margin from which to establish a damage award.

2          Defendants' argument that the jury improperly considered Plaintiff's counsel's argument

3   for a twenty percent base is not supported by the jury's verdict.  Based on Plaintiff's view of the

4   evidence, Plaintiff's attorney argued for $255,000 in trade dress damages.   The jury awarded

5   $100,000 on this claim.   As such, the jury used some number less than the 20 to 25 percent

6   advanced by Plaintiff and made a determination of the profits lost from the sale of each

7   infringing machine, taking into account both fixed and variable expenses.   Thus, viewing the

8   evidence in the light most favorable to Plaintiff, a possible outcome is the jury's damage award

9   of $100,000 for the trade dress claim.

10  **B. Dilution**

11         Defendants contend that they are entitled to judgment as a matter of law on Plaintiff's

12  dilution claim because Plaintiff failed to establish that its marks were famous and failed to

13  establish the amount of damages caused by Defendants with respect to trademark dilution.

14  Dilution refers to the whittling away of the value of a trademark when it is used to identify

15  different products.  Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir.2002).

16  "Dilution is a cause of action invented and reserved for a select class of marks--those marks with

17  such powerful consumer associations that even non-competing uses can impinge on their value."

18  Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir.1999).   Dilution is "the lessening

19  of the capacity of a famous mark to identify and distinguish goods or services, regardless of the

20  presence or absence of--(1) competition between the owner of the famous mark and other parties,

21  or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.   Only famous marks are

22  protected.   15 U.S.C. § 1125(c)(1).

23         In this case, the court instructed the jury on the relevant law of dilution.   The jury was

24  instructed as following regarding the elements of Plaintiff's dilution claim:

25              The term "dilution" means the lessening of the capacity of a famous mark
            to identify and distinguish goods or services, regardless of the presence or absence
26          of competition between the owner of the famous mark and other parties, or
            likelihood of confusion, mistake, or deception.

27

28                                                14

To prevail on its dilution claim, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1.  Plaintiff owns a valid, protectable trademark;
2.  Plaintiff's mark is famous;
3.  Defendant is making commercial use of the mark in commerce;
4.  Defendant's use of the mark began after the mark became famous;
5.  Defendant willfully intended to trade on the owner's reputation or to cause dilution of the famous mark; and
6.  Defendant's use of the mark has caused actual dilution of Plaintiff's mark.

The mark used by Defendant must be identical, or nearly identical, to Plaintiff's protected mark.

## *1. Famousness*

Defendants contend that they are entitled to a directed verdict because Plaintiff failed to establish that its marks were famous.   In order to be famous, a mark must be more than distinctive. Avery Dennison Corp., 189 F.3d at 923. "[I]f dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we would upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses." Id.  To meet the famousness element of protection under the dilution statutes, "'a mark [must] be truly prominent and renowned.'" Id. at 875 (quoting I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 46 (1st Cir.1998)).   "Because protection from dilution comes close to being a right in gross, it is a cause of action reserved for a select class of marks--those marks with such powerful consumer associations that even non-competing uses can impinge on their value."  Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1011 (9th Cir. 2004);  Avery Dennison, 189 F.3d at 875.   Dilution protection is only given to those whose mark is a "household name." Nissan Motor Co., 378 F.3d at 1011; Thane Int'l., Inc. v. Trek Bicycle Corp., 305 F.3d 894, 911 (9th Cir.2002).

If a mark is famous only to a small segment of buyers, such as professional buyers in a specialized market (e.g. professional florists) or a distinct subset of consumers (e.g. owners of pleasure sailing boats) the mark is eligible for anti-dilution protection against a defendant who is using the mark in the same niche market.  See, e.g., Times Mirror Magazines, Inc. v. Las Vegas

1  Sports News, L.L.C., 212 F.3d 157, 165-66 (3d Cir. 2000); Syndicate Sales, Inc. v. Hampshire

2  Paper Corp., 192 F.3d 633 (7th Cir. 1999); Avery, 189 F.3d 868 (9th Cir. 1999).    The market

3  niche should be defined narrowly.    Thane, 305 F.3d 894.  "[A] mark not famous to the general

4  public is nevertheless entitled to protection from dilution where both the plaintiff and defendant

5  are operating in the same or related markets, so long as the plaintiff's mark possesses a high

6  degree of fame in its niche market."  Times Mirror Magazines, 212 F.3d at 166.

7        Title 15 U.S.C. § 1125(c)(1)(A)-(H), lists eight non-exclusive considerations for the

8  famousness inquiry.    The jury was instructed in these requirements.

9        To meet the famousness element of a dilution claim, the mark must be prominent
       within the relevant market.    In determining whether a mark is famous, you may
10       consider factors such as:
       (A)    The degree of inherent or acquired distinctiveness of the mark;
11       (B)    The duration and extent of use of the mark in connection with the goods or
              services with which the mark is used;
12       (C)    The duration and extent of advertising and publicity of the mark;
       (D)    The geographical extent of the trading area in which the mark is used;
13       (E)    The channels of trade for the goods or services with which the mark is
              used;
14       (F)    The degree of recognition of the mark in the trading areas and channels of
              trade used by plaintiff and defendant;
15       (G)    The nature and extent of use of the same or similar marks by third parties;
              and
16       (H)    Whether the mark was registered.

17  *a. The Mark's Inherent or Acquired Distinctiveness*

18        "To be capable of being diluted, a mark must have a degree of distinctiveness and

19  strength beyond that needed to serve as a trademark." Avery Dennison, 189 F.3d at 876 (internal

20  cites and quotes omitted).  The evidence at trial showed that the marks at issue are registered.

21  The Scroll Design logo was registered on March 13, 1990 as a trademark for machines applying

22  labels to containers and parts.    The Scroll Design logo was registered on December 31, 2002 as a

23  service mark.    The ByH mark was registered on November 19, 2002 as a service mark.    The

24  B&H mark was registered on October 1, 2002 as a service mark.    Plaintiff's registration of its

25  marks with the United States Patent and Trademark Office provided evidence that the marks are

26  distinct.  See Times Mirror Magazines, 212 F.3d at 165;  Miss World (UK) Ltd. v. Mrs. America

27

28                                             16

1  Pageants, Inc., 856 F.2d 1445, 1448 (9th Cir.1988).

2      Plaintiff's choice of marks provides further evidence of distinctiveness.  Both B&H and

3  ByH, which means B&H in Spanish, is suggestive of Plaintiffs's products because it is Plaintiff's

4  name.  The Scroll Design logo was an arbitrary logo that Plaintiff assigned to identify its

5  products.  Plaintiff combined the B&H and ByH marks with the Scroll Design logo to identify its

6  product.   From these facts, the jury could have concluded this factor supports a finding that

7  Plaintiff's marks were distinctive.

8  *b. Duration and Extent Use*

9      The evidence introduced at trial revealed that the B&H mark has been in use in Mexico

10  since at least the early 1990's, and probably even as early as 1976.   The evidence introduced at

11  trial also revealed that the Scroll Design logo has been in use since approximately the early

12  1990's.  The ByH mark has been used since 1997, when Plaintiff incorporated ByH de Las

13  Americas, Inc.   In 1997, Plaintiff was using the ByH mark in conjunction with the Scroll Design

14  logo to market itself and its products and services in Mexico and Latin America.   Making all

15  inferences to support the jury's verdict, the court finds the jury could conclude that Plaintiffs' use

16  of its marks were long-standing in the Mexican and Latin American market for roll-fed labeling

17  machines.   As such, this factor suggests that Plaintiffs' marks were famous enough to qualify for

18  protection from dilution.

19  *c. Duration and Extent of Advertising and Publicity*

20      The evidence admitted at trial suggests that Plaintiff advertised its products and services

21  and the B&H mark, the ByH mark, and the Scroll Design logo in Mexico and Latin America.

22  Plaintiffs admitted into evidence copies of several advertisements using these marks.   These

23  advertisements go back at least as early as 1997.  Plaintiff's advertisements containing the marks

24  included, among other things, press releases, magazine ads, and brochures.   Construing the

25  evidence in the way that best supports the jury's verdict, there was evidence to support a finding

26  that by at least 1997 Plaintiffs had done advertising using the marks in the United States, Mexico,

27

28                                     17

and Latin America.   This factor provides evidence that, as of 1997, Plaintiffs' marks were

famous enough in the niche market to qualify for protection from dilution.

*d. The Geographic Extent of the Trading Area*

By at least the early 1990's, Plaintiff used its marks in the niche market of roll-fed

labeling machines throughout Mexico and Latin America.   In fact, by 1998 it appears Plaintiff

was using its marks around the world to sell its roll-fed labeling machines.   The wide geographic

area in which Plaintiff used its marks for advertisement of roll-fed labeling machines suggests

that they were famous enough to qualify for protection from dilution.   <u>See</u>, <u>e.g.</u>, McCarthy, §

24:92 (stating that mark ordinarily should not be deemed famous unless it has been used on a

substantially national scale).   This factor provides evidence from which the jury could conclude

Plaintiffs' marks were famous enough in the niche market to qualify for protection from dilution.

*e. Channels of Trade for the Goods With Which the Mark is Used*

"This factor merely requires the court to define the product or service line or market

within which the plaintiff's mark is used and has become famous." McCarthy at § 24:92.   The

court finds the relevant niche market was the market for roll-fed labeling machines in Mexico

and Latin America.

*f.  Degree of Recognition in the Trading Areas and Channels of Trade Used By Plaintiffs and
Defendants*

This factor appears to overlap somewhat with the first factor. This factor looks at how

recognizable or famous Plaintiff's marks were in the Defendants' trading area (i.e., Mexico and

Latin America).   The evidence at trial indicated that both Plaintiff and Defendants were

competing within the narrow market of selling roll-fed labeling machines and parts in Mexico

and Latin America.   In fact, evidence was admitted at trial indicating that Defendants were

targeting Plaintiff's specific customers.

The court does recognize that there was only limited evidence concerning whether

consumers in the relevant market recognized "B&H," "ByH," and the Scroll Design logo.

18

1    However, on this motion the court finds there was a legally sufficient evidentiary basis for a

2    reasonable jury to find sufficient recognition of Plaintiff's marks.  Mr. Dadisho testified about an

3    incident in which a customer believed parts had been made by Plaintiff because they contained

4    the ByH symbol and Scroll Design logo.   The customer apparently believed that there was no

5    difference between equipment purchased from Plaintiff and equipment purchased from

6    Defendants.  This specific example was reinforced by other evidence indicating that customers

7    were confused between Plaintiff's and Defendants' products.  Luis Higareda testified about a

8    time he was blamed for not having properly fixed a part by a customer because the customer

9    incorrectly believed B&H, rather than ByH, had fixed the part.   Mr. Garcia Sanchez also

10   testified about an incident where a customer did not realize any difference between B&H and

11   ByH.   Although the evidence showing the recognition of Plaintiff's marks in the Mexican and

12   Latin American markets for roll-fed labeling machines was limited, making all inferences in

13   favor of the jury's verdict, the court does not find such evidence was absent.   From this

14   evidence, a reasonable jury could conclude that Plaintiffs' marks were famous enough in the

15   niche market to qualify for protection from dilution.

16   *g. Use of the Same or Similar Marks by Third Parties*

17          Evidence of a mark's use by others "is relevant because, when a mark is in widespread

18   use, it may not be famous for the goods or services of one business."  Avery Dennison, 189 F.3d

19   at 878 (internal quotes and cites omitted); see also McCarthy, § 24:92 ("A mark that is merely

20   one in a 'crowd' of similar marks will not usually be 'famous'").   No evidence was admitted at

21   trial indicating that third parties also use the marks "B&H," "ByH," and the Scroll Design logo.

22   This factor support's the jury's finding that Plaintiff's marks were famous.

23   *h. Registration*

24          As discussed above, Plaintiff's marks were federally registered.  This factor suggests the

25   marks were famous enough for protection from dilution under federal law, and support's the

26   jury's finding.

27

28                                                    19

*i. Balancing*

Making all inferences in Plaintiff's favor, the court finds that evidence was admitted at trial suggesting the presence of all eight factors supporting a finding of famousness. The evidence supports the jury's finding that Plaintiff's mark was famous enough in the niche market to qualify for protection from dilution under federal law.

In their brief, Defendants contend that merely reviewing the factors set forth in Section 1125(c)(1)(A) is insufficient to find famousness. Defendants contend that Plaintiff must make a minimal showing of the requisite level of fame before Section 1125(c)(1)(A)'s factors are even addressed. Defendants contend Plaintiff has failed to show the requisite level of fame. Defendants cite to Thane Intern., Inc. v. Trek Bicycle Corp. to support this position. In Thane Intern., the Ninth Circuit stated:

> In many cases, the list of famousness factors contained in the statute can be quite useful in assisting a fact-finder to determine whether a mark is famous. § 1125(c)(1)(A) to (H). But the party seeking protection must initially make at least a minimal showing of the requisite level of fame. In this case, Trek has presented no evidence that its TREK mark has achieved fame among the general consuming public, as opposed to simply among bicycle enthusiasts.

Thane Intern., 305 F.3d at 911. This quote from Thane is found in the Ninth Circuit's analysis of famousness outside a niche market. Concerning the difference between dilution in a niche market and dilution in general, the Ninth Circuit stated: "While the antidilution statute can protect marks under the niche fame concept from dilution within their specialized markets, the main thrust of the statute is to provide select marks with broad anti-appropriation protection both within and beyond their specialized markets. Such protection is both more potent and more difficult to obtain than niche fame protection." Id. at 910. In this action, Plaintiff has not sought dilution protection outside of the niche market of roll-fed labeling machines in Mexico and Latin America. As such, the requirement that Plaintiff's marks be a "household name," "achieved fame among the general consuming public," and have a requisite level of fame apart from Section 1125(c)(1)(A)'s factors is not required. Viewed in the light most favorable to Plaintiff, a

1  reasonable jury could conclude Plaintiff's marks were famous in the niche market.

2  ***2. Damages***

3        An injunction is allowed in a dilution action pursuant to 15 U.S.C. § 1125(c)(1).

4  Monetary damages are allowed pursuant to section 1125(c)(2) if there is a showing of willful

5  intent "to trade on the owner's reputation or to cause dilution of the mark."  Because the

6  traditional remedy against dilution was an injunction, the notion of how to calculate monetary

7  damages for dilution has been unexplored in case law.  McCarthy § 24:73.   McCarthy has stated

8  that "it is hard to envision how one would begin to compute or measure money damages to

9  compensate for the subtle, but real, blurring, tarnishment or dissonance that is caused by

10  dilution."  Id.  McCarthy has speculated that a plaintiff would need to present some reasonable

11  method for measuring its damages.  McCarthy § 24:99.

12        In general, trademark remedies are guided by tort law principles.  Lindy Pen Co., Inc. v.

13  Bic Pen Corp., 982 F.2d 1400, 1407-08 (9th Cir. 1991); Broan Mfg. Co., Inc. v. Associated

14  Distributors, Inc., 923 F.2d 1232, 1235 (6th Cir.1991).  In addressing monetary damages in

15  trademark cases, the Ninth Circuit has stated:

16      As a general rule, damages which result from a tort must be established with
    reasonable certainty. Dan B. Dobbs, Remedies § 3.3, at 151 (1973). The Supreme

17      Court has held that "[d]amages are not rendered uncertain because they cannot be
    calculated with absolute exactness," yet, a reasonable basis for computation must

18      exist. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47
    S.Ct. 400, 405, 71 *1408  L.Ed. 684, 691 (1927). Many courts have denied a

19      monetary award in infringement cases when damages are remote and speculative.
    See generally Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 642 (D.C.Cir.1982)

20      ("any award based on plaintiff's damages requires some showing of actual loss");
    Burndy Corp. v. Teledyne Industries, Inc., 584 F.Supp. 656, 664 (D.C.Conn.) ("no

21      assessment of damages is authorized if it is not based on actually proven
    damages."), aff'd 748 F.2d 767 (2d Cir.1984); Invicta Plastics (USA) Ltd. v. Mego

22      Corp., 523 F.Supp. 619, 624 (S.D.N.Y.1981) ("damages will not be awarded in
    the absence of credible evidence demonstrating injury to the plaintiff from

23      defendant's sales."); Vuitton et Fils, S.A. v. Crown Handbags, 492 F.Supp. 1071,
    1077 (S.D.N.Y.1979) ("The discretionary award of either damages or profits

24      assumes an evidentiary basis on which to rest such an award. Without such a basis
    there can be no recovery."), aff'd mem., 622 F.Supp. 577 (2d Cir.1980).

25

26  Lindy Pen Co., 982 F.2d at 1407-08.  Under general tort principles "the infringer-tortfeasor is

27

28              21

1  liable for all injuries caused to plaintiff by the wrongful act, whether or not actually anticipated or

2  contemplated by the defendant when it performed the acts of infringement." <u>Broan</u>, 923 F.2d at

3  1235 (quoting McCarthy § 30:27 (2d ed.1984)).   In trademark cases courts draw a sharp

4  distinction between proof of the fact of damage and proof of the amount of damage.  <u>Broan</u>, 923

5  F.2d at 1235. To be entitled to damages the plaintiff must prove that some damages were the

6  certain result of the wrong.  <u>Broan</u>, 923 F.2d at 1235; <u>Otis Clapp & Son, Inc. v. Filmore Vitamin</u>

7  <u>Co.</u>, 754 F.2d 738, 745 (7th Cir.1985).   Damages are precluded where the damage claimed is not

8  the certain result of the wrong.  <u>Broan</u>, 923 F.2d at 1235. "Once the existence of damages has

9  been shown, all that an award of damages requires is substantial evidence in the record to permit

10  a fact finder to draw reasonable inferences and make a fair and reasonable assessment of the

11  amount of damages." <u>Broan</u>, 923 F.2d at 1236.   These standards are best summed up by the

12  finding that after exhaustive review of cases, the policy and theoretical basis underlying monetary

13  awards in trademark cases have received inadequate judicial attention and have remained

14  confused and undefined.   McCarthy § 30:58.

15        Based on these standards and construing the evidence in the light most favorable to

16  Plaintiff, the only reasonable conclusion is not that the jury's damage award for dilution is not

17  supported by any evidence or legal authority.   Defendants' basic position is that a directed

18  verdict is required because Plaintiff provided no specific evidence of an exact amount of

19  monetary damage caused by Defendants' dilution of Plaintiffs' marks.   The court does not find

20  that Plaintiff's failure to have an expert testify to an exact allocation of damages for Defendants'

21  dilution requires a directed verdict.   The jury was provided with evidence concerning Plaintiff's

22  and Defendants' sales in Mexico and Latin America.    The jury was also provided with evidence

23  concerning Plaintiff's and Defendants' costs.   The jury was provided with evidence concerning

24  potential lost sales caused by Defendants' conduct.   The jury was provided with evidence that

25  Defendants' use of Plaintiff's marks caused confusion in the niche market and required

26  corrective advertising.   The evidence showed that Defendants used Plaintiff's marks on

27

28                                                      22

1  voluminous documents, including, among other things, invoices, advertising, and letterhead.

2  The jury was given evidence showing sales of machines and parts which directly infringed on

3  Plaintiff's marks.   Both parties introduced evidence of Plaintiff's damages based on Defendants'

4  sales.   Given this evidence, the court finds that the jury could determine a reasonable damage

5  award for Defendants' dilution of Plaintiff's marks.   The only possible outcome from this

6  evidence is not that Plaintiff's dilution claim fails because of the lack of specific evidence

7  concerning an amount of damages.   Thus, a directed verdict is not required on Plaintiff's dilution

8  claim.

9                                    **ORDER**

10         Accordingly, based on the above memorandum opinion and order, the court ORDERS

11  that Defendants' renewed motion for judgment as a matter of law on Plaintiff's claims of trade

12  dress infringement and trademark dilution is DENIED.

13

14  IT IS SO ORDERED.

15  **Dated:    May 11, 2005        _____/s/ Anthony W. Ishii_____**
       0m8i78                                  UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28                                      23